OPINION OF THE COURT
Chief Judge Wachtler.
Defendant was convicted, after a trial by jury, of two counts of first degree sodomy (Penal Law § 130.50 [1]). The Appellate Division reversed the judgment of conviction and remitted the matter for a new trial on the third degree sodomy counts not reached by the jury, on the ground that the People had. failed to adduce sufficient evidence of forcible compulsion. Specifically, the Appellate Division held that, because the encounter took place while defendant and the victim were separated by *413 jail bars, the defendant’s threats to injure the victim or have others do so could not be carried out "immediately” and therefore did not constitute forcible compulsion as that term is defined in the Penal Law (§ 130.00 former [8]). We now reverse and remit to the Appellate Division for the exercise of its factual review powers and for the determination of other issues not reached on the appeal to that court.
I.
To determine whether a jury verdict is supported by legally sufficient evidence, a reviewing court must consider "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial * * * and as a matter of law satisfy the proof and burden requirements for every element of the crime charged” (People v Bleakley, 69 NY2d 490, 495 [citing Cohen v Hallmark Cards, 45 NY2d 493, 499]). Thus, because the jury returned a guilty verdict, the evidence must be viewed by us in the light most favorable to the People. From that perspective, the trial evidence established the following.
The events in question took place on August 6, 1981, while defendant and the victim were both inmates at the Albany County jail. The victim, a 16-year-old male, had been in the jail slightly less than three weeks, awaiting disposition of charges that he had sold hashish. He occupied a cell in the first east tier of the jail, a portion of the jail reserved for unsentenced juveniles. The juvenile tier consists of 25 cells which open to a common walkway known as the bullpen. The cells are routinely unlocked during most of the day, so that the bullpen area is accessible to all inmates on the tier. Beyond the bullpen, and separated from it by a set of bars, is a parallel walkway referred to in the testimony as the catwalk. The bullpen and the catwalk each end in a locked gate, tended by a correction officer, which separate the tier from the rest of the jail. Jail policy prohibits adult inmates from entering the juvenile tier.
The defendant, a 35-year-old male, was housed in one of the adult tiers. He had spoken to the victim on three occasions prior to the August 6 incident, twice in the mess hall, where they engaged in conversation about their backgrounds, and once in or near the weight-lifting room, where defendant commented on the victim’s slight stature and demonstrated *414 his own strength by lifting the victim over his head. The victim testified that he was about five feet, six inches tall and weighed approximately 120 pounds. He estimated that defendant was six-feet tall and weighed about 180 pounds.
Sometime between 11:00 a.m. and noon on August 6, defendant approached the correction officer on duty at the gate to the juvenile tier and asked to be permitted into the tier to speak to an inmate. Despite the policy prohibiting such access, defendant was admitted to the catwalk area. The guard then returned to his desk, from which point he was unable to view the tier.
Defendant called to the victim through the bars separating the catwalk from the rest of the tier. The victim exited his cell and approached the bars. Defendant then stated that he wanted the victim to perform an act of oral sex. When the victim refused, defendant issued the threats which are the focus of this appeal. According to the victim:
"[H]e started to threaten me and say he could have people kick my ass if I didn’t do it.
* * *
"He told me that anything could happen to me if I walked off the tier. It could happen anywhere, he said. I could get beat up anywhere, it could even be somebody on the tier if he wanted to.
* * *
"He said that he could put the word out on me if he wanted to and he could have anybody kick my ass.
* * *
"[H]e said it was a matter of trusting him and if I did it with him I wouldn’t have to worry about it. I wouldn’t have to be worried about being bothered again and if I didn’t do it, that, you know, the same thing would happen.
* * *
"He would make sure I would have a rough time while I was there.
* * *
"He just meant that, you know, he could have somebody kick my ass if he wanted to.” *415 Another inmate on the tier testified that he viewed the incident and heard defendant state, "[I]f you don’t give me no piece of ass I’ll kick your ass.”
Following these threats, the victim complied with defendant’s requests that he submit to various acts of sodomy. Defendant renewed his threats between episodes. During the entire incident the two remained on opposite sides of the bars of the catwalk.
That afternoon the victim asked to be placed in protective custody, and the following day he reported the incident to officials. Defendant was charged in an indictment with two counts of first degree sodomy and two counts of third degree sodomy. Following a trial, a jury found defendant guilty of the two first degree counts but did not reach the third degree counts, pursuant to the court’s instructions.
II.
First degree sodomy, as charged in the indictment against defendant, occurs when the actor "engages in deviate sexual intercourse with another person * * * [b]y forcible compulsion” (Penal Law § 130.50 [1]). At the time of the alleged crime, forcible compulsion was defined as follows: "physical force which is capable of overcoming earnest resistance; or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped” (Penal Law § 130.00 former [8]).[1]
The Appellate Division concluded that defendant’s threats did not rise to the level of forcible compulsion because they were not "capable of immediately being carried out” (132 AD2d 885, 886). We note at the outset that, although it may not have been so intended, to the extent that this standard would relieve a defendant of criminal liability simply because he is, in fact, incapable of making good on his threats, it must be rejected.
As we stated in a similar situation, the inquiry required in determining whether threats amount to forcible compulsion is not what the defendant would or could have done, "but rather what the victim, observing [the defendant’s] conduct, feared *416 [he] would or might do if [the victim] did not comply with [his] demands” (People v Coleman, 42 NY2d 500, 505). The proper focus is on the state of mind produced in the victim by the defendant’s conduct, because the sine qua non for criminal liability for sex offenses under our Penal Law is lack of consent, resulting from either forcible compulsion or incapacity to consent (see, Penal Law § 130.05).
The impossibility or improbability of the defendant’s assertions may be relevant considerations for the fact finder in determining whether the victim was actually placed in fear or whether the defendant intended such an effect. But the fact that a court may, in hindsight, determine that the threats were incapable of being executed cannot transform the victim’s submission to them into consent. As the drafters of the Model Penal Code noted, "It seems clear * * * that one who takes advantage of [a victim’s] unreasonable fears of violence should not escape punishment any more than a swindler who cheats gullible people by false statements which they should have found incredible. Neither the blameworthiness of the actor nor the gravity of the insult to the victim is ameliorated by a finding that the threat was implausible or that the actor lacked capacity to carry it out” (ALI, Model Penal Code and Commentaries § 213.1, at 310). For that reason, the Model Penal Code rejected the requirement, common in many jurisdictions at the time, that the victim’s reaction to threats be reasonable or that the actor have the present capacity to inflict the harm feared (id.). Notably, New York’s contemporaneous revision of its Penal Law (L 1965, ch 1030), which was heavily influenced by the Model Penal Code (see, People v Goetz, 68 NY2d 96, 109), resulted in a new definition of forcible compulsion which eliminated the prior requirement that the victim have "reasonable cause to believe” that the threatened harm would be inflicted (see, 1881 Penal Code § 278 [4] [rape]; 1909 Penal Law § 690 [3], as amended by L 1950, ch 525, § 15 [sodomy]; § 2010 [3] [rape]).
Thus, the proper question is not whether the defendant was capable of carrying out his threats, but rather whether the jury could reasonably infer that those threats placed the victim in fear of "immediate death or serious physical injury” (Penal Law § 130.00 former [8]). We conclude that the trial evidence was sufficient to justify such an inference.
Defendant contends that the evidence failed to establish that there was a threat of immediate harm. According to *417 defendant, the evidence established, at most, that the threats were to have the victim assaulted by someone else at some indefinite time in the future. This characterization of the evidence, however, ignores several important aspects of the testimony.
Most significantly, defendant fails to take into account his threat that the victim "could get beat up anywhere, it could even be somebody on the tier”. With the cell doors unlocked, as they were throughout the day, the inmates within the juvenile tier had immediate access to the victim. The evidence also established that at least two of those inmates, including one considered by the victim to be a friend, viewed the incident without offering the victim any assistance. The victim was only 16 years old and a novice to the world of incarceration. The defendant was more than twice his age, powerfully built, and had made it clear to the victim that he held a position of power in the oppressive and unfamiliar environment the victim had recently entered. Indeed, defendant’s mere presence in the restricted juvenile tier was evidence of the influence at his disposal. That the defendant was not specific about when the threats might be carried out is of little consequence. The breadth of his threats encompassed the possibility that the harm could be delivered by anyone, including those with immediate access to the victim, and at anytime, including the present. The evidence, therefore, viewed as a whole, provided a sufficient basis for the jury’s conclusion that defendant’s threats placed the victim in fear of immediate death or serious physical injury.[2]
III.
Thus, the Appellate Division erred in concluding that the evidence of forcible compulsion was legally insufficient. Because of that error, the court did not exercise its factual review powers and the case must be remitted for further proceedings. We have examined defendant’s remaining legal contentions in support of an affirmance and find them to be either unpreserved or without merit.
*418 Accordingly, the order of the Appellate Division should be reversed and the case remitted for further proceedings in accordance with this opinion.
Judges Simons, Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.

. The definition of forcible compulsion has since been amended to eliminate the requirements of "earnest resistance” (L 1982, ch 560) and fear that a threatened physical injury be "serious” (L 1983, ch 449).

. In light of this conclusion, we need not decide whether forcible compulsion can result from threats that put the victim in fear of retaliation —i.e., threats that the victim understands can only be accomplished in the future. The parties to this appeal appear to agree that the term "immediate” in Penal Law § 130.00 former (8) ("fear of immediate death or serious physical injury”) requires that the victim fear harm in the very near future.