10-5010-pr
Santone v. Fischer

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued: May 17, 2012                                    Decided: August 7, 2012)

Docket No. 10-5010-pr

_____

BRIAN SANTONE a/k/a Brian Irwin,

                                        Petitioner-Appellant,

                        - v. -

BRIAN FISCHER, Superintendent,

                                        Respondent-Appellee.

_____

Before:  KEARSE, POOLER, and LIVINGSTON, Circuit Judges.

Appeal from a judgment of the United States District Court for the Northern District of New York, Norman A. Mordue, then-Chief Judge, denying petition pursuant to 28 U.S.C. § 2254 to vacate certain state-court convictions on grounds of insufficiency of the evidence and ineffective assistance of counsel.

Affirmed.

Judge Pooler concurs in a separate opinion.

SALLY WASSERMAN, New York, New York, for
Petitioner-Appellant.


PAUL B. LYONS, Assistant Attorney General, New
York, New York (Eric T. Schneiderman, Attorney General of the State
of New York, Barbara D. Underwood, Solicitor General, Roseann B.
MacKechnie, Deputy Solicitor General, New York, New York, on the
brief), for Respondent-Appellee

KEARSE, Circuit Judge:

Petitioner Brian Santone, a New York State ("State") prisoner formerly known as Brian Irwin and convicted as Brian F. Irwin (hereinafter "Irwin") of, to the extent pertinent here, assault in the first degree and witness intimidation in the third degree, appeals from a judgment of the United States District Court for the Northern District of New York, Norman A. Mordue, then-Chief Judge, denying Irwin's petition pursuant to 28 U.S.C. § 2254 for vacatur of his convictions of the above offenses on the grounds (1) that the evidence was insufficient to show that he had caused serious physical injury, an element of at least two of Irwin's assault offenses, and (2) that he received ineffective assistance of counsel with respect to the above witness intimidation count. The district court denied the petition on the ground that Irwin failed to show that the state courts either misapplied or unreasonably applied the standard set by Jackson v. Virginia, 443 U.S. 307 (1979), for a claim of insufficiency of the evidence, or the standard set by Strickland v. Washington, 466 U.S. 668 (1984), for a claim of ineffective assistance of counsel. On appeal, pursuant to a limited certificate of appealability (or "COA") granted by this Court, Irwin contends that he made the required showings, and, alternatively, that the district court could not properly conclude to the contrary without conducting an evidentiary hearing. For the reasons that follow, we conclude that Irwin's contentions are without merit.

# I. BACKGROUND

The State's prosecution of Irwin had its origin in an altercation in Watertown, New York, in the early morning hours of September 3, 2000, between Irwin and his acquaintance Steven (or Stephen) J. Smalls, who had given local law enforcement officers information implicating Irwin in a crime that occurred in late 1999. The State's witnesses included persons who were acquainted with both Irwin and Smalls and who described Irwin's initiation of the assault on Smalls, which followed statements by Irwin that "he was going to get" Smalls because Smalls had previously "got [Irwin] arrested." The evidence at trial also included a machete-type knife, photographs, and medical records.

As the present case principally presents "a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, we review the evidence in the light most favorable to the State." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) ("Ponnapula"); see, e.g., Lewis v. Jeffers, 497 U.S. 764, 781 (1990); Jackson v. Virginia, 443 U.S. at 319.

## A. The Assault on Smalls

At approximately 3 a.m. on September 3, Smalls was sitting in the passenger seat of a car parked in front of a building at which a party was in progress. When Irwin, who was nearby, learned--from a friend who testified at trial--that Smalls was there, Irwin and another friend, William Flagg, ran to the car, reached in, and tried to pull Smalls out. When Smalls resisted, Irwin repeatedly stabbed him in the hand and arm with a machete-type knife that was some 12-14 inches long. Smalls scrambled into the driver's seat and managed to drive away before Irwin and Flagg could run around to that side of the car.

Smalls drove to a nearby gas station and Mini Mart; he exited the car, leaving the door open and the motor running, and approached a taxi at the gas pumps to ask the driver for help. He then started back toward the entrance to the Mini Mart but collapsed near the door and lay there, bleeding and not moving. The Mini Mart clerk called 911.

Patrol Officer John Oliveau, who was dispatched to the Mini Mart at 3:06 a.m., was the first police officer to reach the scene; another officer who arrived thereafter had received a dispatch call at 3:02 a.m. Oliveau testified that Smalls was lying in a pool of blood about six-to-eight inches in diameter, that his clothes were blood-soaked, and that he appeared to be in a great deal of pain and to be going into shock. Smalls was unable at first to communicate verbally but eventually was able to say that he had been stabbed by Irwin, about whom he had previously given a statement to law enforcement authorities. Oliveau testified that an ambulance arrived within two minutes.

A Prehospital Care Report prepared by the emergency medical responders ("EMS Report" or "Report"), shows that they received a call at 3:07 a.m., that their ambulance arrived at the Mini Mart at 3:10, and that they found Smalls bleeding and in shock. The medical responders took Smalls to a nearby hospital, after having spent some nine minutes attempting to stabilize his condition by, inter alia, applying pressure to slow the bleeding. The ambulance transporting Smalls arrived at the hospital at 3:22; a physician's report completed after an examination of Smalls in the emergency room stated that one of Smalls's wounds was still "actively bleeding."

The EMS Report estimated that, at the Mini Mart, there were two liters of blood on the ground. Oliveau and the other police officer testified that there was also blood throughout the front interior of Smalls's car--on both front seats, on the console between the seats, on a bag between the seats, and on the dashboard. In addition, there was a trail of blood on the ground for some 10-to-15 feet leading from Smalls's car toward the gas pumps, and another trail of blood from there toward the

4

door of the Mini Mart. The evidence included photographs of the car, its blood-soaked and -splattered front interior, the blood trails and pool of blood on the ground, and Smalls's blood-soaked clothing.

At the first hospital to which he was taken, Smalls was treated for stab wounds to his left arm and to his right hand which had one tendon 50-percent severed, another tendon completely severed, and nerve damage. Later that morning he was transferred to another hospital for surgery on his hand and arm. Smalls's arm was operated on by the trauma surgeon on call; surgery on Smalls's right hand--his dominant hand--was performed by a hand specialist; and Smalls was released from the hospital that day. The hand surgeon testified that although the damage to the half-severed tendon--if that tendon did not rupture further--probably would not be "too" disabling, the wholly severed tendon and the nerve damage were "a serious injury to the hand."

The State also called as a witness Michael Young, who had met Irwin in jail following Irwin's arrest for the assault on Smalls. Young testified as to what Irwin told him about the assault, i.e., that Irwin said he and Flagg had cornered Smalls in his car and Flagg held Smalls's legs while Irwin tried to stick Smalls with a big knife with a brass-knuckle-handle grip. (The knife used by Irwin had been found by the police; it was introduced in evidence at trial and was identified by two of the eyewitnesses to the assault.) Irwin told Young that Smalls had deserved what he got because "snitches get stitches"; that if anyone were to testify against Irwin, they would pay when Irwin got out of jail because if they ruined his life, he would ruin theirs; and, having cut Smalls's hand, Irwin "said that every time [Smalls] looked at his hand he would remember [Irwin]."

B.  The State-Court Proceedings

Irwin was indicted by a State grand jury on six counts. Counts 1-3 charged him with assault in the first degree against Smalls, in violation of, respectively, three subsections of New York

5

Penal Law § 120.10 that provide as follows:

> A person is guilty of assault in the first degree when:
>
> 1. With intent to cause <u>serious physical injury</u> to another person, <u>he causes such injury</u> to such person or to a third person by means of a deadly weapon or a dangerous instrument; or
>
> 2. With intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or
>
> 3. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes <u>serious physical injury</u> to another person . . . .

N.Y. Penal Law §§ 120.10(1)-(3) (McKinney 1997) (emphases added). "'Serious physical injury'"

is defined as a

> physical injury which <u>creates a substantial risk of death,</u> <u>or</u> which <u>causes</u> death or <u>serious and protracted disfigurement</u>, protracted impairment of health or <u>protracted loss or impairment of the function of any bodily organ</u>.

N.Y. Penal Law § 10.00(10) (McKinney 1997) (emphases added).

In connection with his assault on Smalls, Irwin was also charged with criminal possession of a weapon in the third degree, in violation of N.Y. Penal Law § 265.02(1) (McKinney 1999) (Count 4), and intimidating a witness in the first degree, in violation of N.Y. Penal Law § 215.17(2) (McKinney 1998) (Count 5). Count 6 charged Irwin with intimidating a witness in the third degree, in violation of N.Y. Penal Law § 215.15(1) (McKinney 1998), alleging that he had attempted, by threatening bodily harm, to prevent a witness--later disclosed to be trial witness Sydne Lee--from testifying against him. As discussed in greater detail in Part II.B. below, prior to the conduct of the voir dire at the start of Irwin's trial, Irwin's trial attorney was unaware of the existence of Count 6.

6

The trial judge instructed the jury in accordance with the above statutory provisions, and the jury found Irwin guilty on all counts. The court sentenced Irwin principally to concurrent 14-year terms of imprisonment on counts 1, 2, 3, and 5; to a concurrent term of 3½-to-7 years' imprisonment on count 4; and to 2-to-4 years' imprisonment on Count 6, to be served consecutively to the other prison terms.

Irwin appealed to the Appellate Division, arguing, inter alia, that there was insufficient evidence to support the convictions of first degree assault. Arguing that the evidence "fails to support the jury's finding that the injuries sustained by Mr. Smalls that night constituted a 'serious physical injury' as that term is defined in the law" (Irwin brief on direct appeal at 5), Irwin began by accurately quoting the complete statutory definition of "serious physical injury" (id.); but he proceeded to ignore the part of the definition that defines a serious physical injury to include one that "creates a substantial risk of death," N.Y. Penal Law § 10.00(10), and argued only that the evidence was insufficient to show a long-term or permanent injury or disfigurement. He stated that

> [t]he statute and case law . . . make it quite plain that an injury, no matter how ugly it may appear in the beginning, is not a "serious physical injury" unless it causes protracted disfigurement, impairment of the health or function of a bodily organ,"

(Irwin brief on direct appeal at 9 (emphases added)), and argued that the evidence in his case was insufficient on the basis that "there was no testimony or other evidence presented concerning the length of time [Smalls] experienced an impairment of the function of his hand or arm" (id. at 5 (emphasis added)); that the "only evidence presented concerning [Smalls's] injury" was the hand surgeon's testimony that "the injury to Mr. Smalls' hand, if left untreated, would not have resulted in any disfigurement or disability" (id. at 5-6 (emphasis added)); that there was only "a possibility that the patient might lose some flexibility in his finger" (id. at 6 (emphasis added)); that "[t]here was no evidence that Smalls did, in fact, lose any flexibility in his finger" or "that Smalls suffered any long-

7

term negative effects from this injury" (id. (emphases added)); and that Smalls "was treated and released from th[e] hospitals on the same day as he was admitted" (id.). Irwin stated, citing several Appellate Division cases, that "[i]njuries far more pain[ful] and long-lasting than the ones presented in the instant case have been found insufficient to support a verdict of Assault in the First Degree" (id. (emphasis added)), and he argued that "in the instant matter, there was absolutely no evidence presented to the jury which would have permitted them to find that the victim suffered any long-term effects from the injury he sustained" (id. at 8 (emphasis added)).

The Appellate Division affirmed Irwin's conviction. See People v. Irwin, 5 A.D.3d 1122, 774 N.Y.S.2d 237 (4th Dep't) ("Irwin I"), lv. denied, 3 N.Y.3d 642, 782 N.Y.S.2d 413 (2004). Rejecting the above sufficiency arguments made by Irwin, the Appellate Division noted that

> the victim's wounds required surgery and, although the victim was unavailable to testify, photographs depicting the sutured wounds to the victim's arm and hand were admitted in evidence. We conclude that the jury could reasonably infer from that evidence that the sutured wounds resulted in permanent scars (see generally People v Gagliardo, 283 AD2d 964 [2001], lv denied 96 NY2d 901 [2001]).

Irwin I, 5 A.D.3d at 1123, 774 N.Y.S.2d at 238. The State had argued to the jury, however, not just that the photographs depicted injuries that were serious and disfiguring, but also that Smalls "lo[st] tons of blood" and was "luck[]y" that "he was able to get treatment"; and the trial court had instructed the jury as to the entire definition of serious physical injury. The Appellate Division thus also addressed the part of § 10.00(10) that defines a "serious physical injury" as one that "creates a substantial risk of death," which Irwin's appellate arguments had ignored. The Appellate Division noted that

> [v]iewing the evidence in the light most favorable to the People (see People v Thompson, 72 NY2d 410, 413 [1988], rearg denied 73 NY2d 870 [1989]), and according the People the benefit of every favorable inference (see People v Ford, 66 NY2d 428, 437 [1985]), we conclude that there is a "valid line of reasoning and permissible inferences which could lead a rational person to the

8

conclusion reached by the jury on the basis of the evidence at trial" (People v Bleakley, 69 NY2d 490, 495 [1987]). Medical evidence established that, as a result of the stabbing, the victim lost two liters of blood before he was attended to by emergency medical personnel, and thus the jury could properly find that if the "injuries had been left untreated [the victim] could have bled to death" (People v Jeanty, 268 AD2d 675, 678 [2000], lv denied 94 NY2d 949 [2000]).

Irwin I, 5 A.D.3d at 1123, 774 N.Y.S.2d at 238 (emphases ours). Leave to appeal to the New York Court of Appeals was denied.

Thereafter, Irwin commenced the present habeas corpus proceeding pro se; after he retained counsel this action was stayed in order to allow Irwin to pursue claims that he had not exhausted in state court. In 2007, he, inter alia, moved in the trial court pursuant to N.Y. Crim. Proc. Law § 440.10 to vacate his convictions on grounds of ineffective assistance of counsel ("IAC") by his trial attorney. The § 440.10 motion argued, among other things, that his trial attorney's lack of pretrial awareness of Count 6 of the indictment prevented counsel from investigating evidence that would have exonerated Irwin on that count. The trial court denied the § 440.10 motion in a Decision Order dated January 20, 2009 ("Irwin II") (see Part II.B. below), and the Appellate Division denied leave to appeal that decision.

C. The Present § 2254 Petition and the COA

Following completion of the state-court § 440.10 proceeding, the present § 2254 case was reopened. Irwin filed an amended petition ("petition") asserting several claims, including insufficiency of the evidence to support his convictions of first-degree assault, denial of his right to be present at sidebar discussions at trial, and a variety of IAC claims, including lack of investigation and preparation by trial counsel with regard to Count 6. The magistrate judge to whom Irwin's petition was referred for consideration recommended, in a Report and Recommendation dated

9

September 13, 2010 ("Magistrate Report"), that the petition be dismissed.

As to Irwin's sufficiency challenge, the magistrate judge stated, inter alia, that

viewing the facts in the light most favorable to the prosecution, the evidence established that Irwin used a fourteen inch knife to stab Smalls in the hand and arm and caused a serious physical injury. The stab wounds caused immense bleeding, with Smalls losing two liters of blood, evidenced by the pooling in the car and parking lot and the stains on Smalls' clothing. Smalls also began to go into shock upon the arrival of the police. . . . Smalls' injuries required surgery to repair the tendons which had been severed, one fully and the other partially, in order to restore gripping and bending function in Smalls' hand and finger. The scarring from the injury was touted by Irwin as a permanent reminder of his attack on Smalls for providing information to the police. The jury observed the sutures as an aide to assessing injuries.

This evidence supported the jury's verdict that the physical injury created a substantial risk of death from the uncontrolled bleeding and caused serious disfigurement. . . . This evidence was found sufficient by the Appellate Division, which explicitly held that a serious physical injury was indicated by the evidence presented at trial. . . . [T]hese factual determinations require deference and a presumption of correctness as they have not been proven to be a contrary or unreasonable application of federal law.

Magistrate Report at 15-16 (emphases added).

As discussed in Part II.B. below, the magistrate judge recommended rejection of Irwin's IAC claim on Count 6 on the grounds that the state court reasonably concluded that trial counsel's performance in investigating that claim was neither deficient nor prejudicial.

The district judge, over Irwin's objections, substantially adopted the reasoning of the Magistrate Report and denied the § 2254 petition. See Santone v. Fischer, No. 9:04-CV-947, 2010 WL 4703396 (N.D.N.Y. Nov. 12, 2010) ("Irwin III"). The court found no basis on which to conclude that the state courts' rejections of Irwin's claims were contrary to, or an unreasonable application of, United States Supreme Court precedents. See Irwin III, 2010 WL 4703396, at *2-*3, *5. It concluded that as to the sufficiency challenge to the convictions of first-degree assault, Irwin had "not carried his burden of showing that 'no rational trier of fact could have found proof of guilt beyond a

10

reasonable doubt,'" id. at *1 (quoting Jackson v. Virginia, 443 U.S. at 324). As to Irwin's claims of ineffective assistance of counsel, the court, applying the two-pronged standard established by Strickland, 466 U.S. at 687 (see Part II.B. below), concluded that Irwin had failed to establish either prong of that standard, see Irwin III, 2010 WL 4703396, at *5.

Judgment was entered denying the petition. By order dated May 5, 2011, this Court granted Irwin a certificate of appealability limited to three issues:

> (1) whether the trial evidence was sufficient to establish that the victim suffered "serious physical injury," thus supporting Appellant's conviction of first-degree assault; (2) whether trial counsel was ineffective for failing to investigate the facts surrounding Appellant's alleged threats made to a State witness, for which Appellant was convicted of third-degree intimidation of a witness; and (3) whether the district court should have held an evidentiary hearing.

## II. DISCUSSION

On appeal, Irwin contends principally that he was entitled to habeas relief (1) setting aside his convictions of offenses that depended on proof that Smalls suffered serious physical injury, arguing principally that the evidence was insufficient to establish that element within the meaning of New York State law, consistent with United States Supreme Court precedent, and (2) setting aside his conviction of witness intimidation in the third degree because his attorney's lack of awareness of that charge in advance of trial denied him effective assistance of counsel. We disagree.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court has

> no authority to issue the writ of habeas corpus unless the [state c]ourt's decision "was contrary to, or involved an unreasonable application of, clearly

11

established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Parker v. Matthews, 132 S. Ct. 2148, 2151 (2012) ("Matthews"). "This is a 'difficult to meet[]' . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . ." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (quoting Harrington v. Richter, 131 S. Ct. 770, 786 (2011) ("Richter") (other internal quotation marks omitted)); see, e.g., Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) ("Johnson"); Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) (state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision). Further, if the state court's decision rests on at least one permissible ground, it must not be rejected. See, e.g., Matthews, 132 S. Ct. at 2152 (where one "ground was sufficient to reject [petitioner's] claim . . . it is irrelevant that the court also invoked a ground of questionable validity").

Thus, although this Court reviews a district-court decision on habeas de novo, see, e.g., Ponnapula, 297 F.3d at 179, "we cannot grant habeas relief where a petitioner's claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense," Anderson v. Miller, 346 F.3d 315, 324 (2d Cir. 2003).

In addition, as discussed in Parts II.A. and B. below, special deference is to be accorded to the state-court decisions that rejected the challenges by Irwin that are at issue on this appeal.

A. Irwin's Sufficiency Challenge

When a federal habeas petition challenges the sufficiency of the evidence to support a state-court conviction, AEDPA establishes a standard that is "twice-deferential." Matthews, 132 S. Ct. at 2152. A state court directly reviewing a jury verdict of guilty must, consistent with United States Supreme Court precedent, "'view[] the evidence in the light most favorable to the prosecution'" and must not uphold a challenge to the sufficiency of the evidence if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. at *3 (quoting Jackson v. Virginia, 443 U.S. at 319 (emphasis in Jackson)). And the federal court in a habeas proceeding "may not . . . overturn[]" the "state-court decision rejecting a sufficiency challenge . . . unless the 'decision was objectively unreasonable.'" Matthews, 132 S. Ct. at 2152 (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (other internal quotation marks omitted)).

In sum, "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts," Johnson, 132 S. Ct. at 2064 (internal quotation marks omitted), and "on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court," id. at 2062 (internal quotation marks omitted) (emphasis added). We see no error in the district court's application of these principles and its rejection of Irwin's challenge to the sufficiency of the evidence to establish that his stabbing of Smalls caused serious physical injury.

Preliminarily, we note that Irwin's contention that the evidence was "INSUFFICIENT TO ESTABLISH SERIOUS PHYSICAL INJURY AS THE STATE OF NEW YORK DEFINES THAT STANDARD" (Irwin brief on the present appeal at 24 (emphasis added); see, e.g., id. at 26 (Smalls's "documented injury did not rise to the level of a serious physical injury as defined by the

13

relevant statute and the decisions of the New York State courts" (emphasis added)); id. at 31 ("the gravity of [Smalls's] injuries did not rise to the level that constitutes a serious physical injury within New York State's definition of that term" (emphasis added))) is not a proper ground for federal habeas relief. "A federal court may not issue the writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); see, e.g., Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010) ("it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts" (emphasis in original)); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Ponnapula, 297 F.3d at 182 (federal due process principles "do[] not invite federal habeas courts to engage in a substantive analysis of state statutory terms," and "[o]ur federal constitution does not dictate to the state courts precisely how to interpret their own criminal statutes").

Further, as quoted in Part I.B. above, New York law defines "serious physical injury" to include injury that "creates a substantial risk of death," N.Y. Penal Law § 10.00(10). That section also provides alternative definitions in terms of long-term disability or permanent disfigurement, and those alternatives are the only parts of the definition on which Irwin focuses, arguing that Smalls did not require "extended hospitalization" (Irwin brief on the present appeal at 27) and that there was no evidence that Smalls suffered "permanent scars" (id. at 35) or "serious disfigurement" (id. at 30; see also Irwin reply brief on the present appeal at 13 ("no[] . . . permanent scarring"); id. at 15 ("no[] . . . serious and protracted disfigurement" (internal quotation marks omitted))). Clearly Smalls did not in fact require extended hospitalization; he was released from the second hospital some 13 hours after he was admitted to the first. And although the jury saw photographs of Smalls's wounds as sutured, and Irwin himself predicted scarring that would cause Smalls to think of Irwin every time Smalls looked at his hand in the future, there was no physical evidence of such disfigurement, as Smalls did not appear at Irwin's trial. But we need not decide whether the Appellate Division, in ruling that there

was sufficient evidence for the jury to find that Smalls's "sutured wounds resulted in permanent scars," Irwin I, 5 A.D.3d at 1123, 774 N.Y.S.2d at 238, invoked a ground of questionable validity, for the court did not base its affirmance of Irwin's first-degree-assault convictions solely on the permanent-disfigurement part of the serious-physical-injury definition. The Appellate Division also found the evidence sufficient to permit the jury to infer that Smalls's stab wounds were life-threatening. Smalls's relatively short hospital stay and the possible lack of permanent scars or long-term disability are not relevant to the sufficiency of the evidence to show that there was a substantial risk that Smalls could have died from his wounds without medical attention.

Similarly, Irwin's argument "that the surgery performed upon [Smalls] was not necessary to save his life" (Irwin brief on the present appeal at 34 (emphasis added)) is irrelevant. The Appellate Division did not rule that Smalls might have died without the surgery; it ruled that, given his loss of some two liters of blood, Smalls could have bled to death if his injuries had been left unattended. And although Irwin cites New York cases in which injuries have been held to be life-threatening from stab wounds to more vulnerable parts of the body such as the head, neck, or chest, nothing in federal constitutional law--or in common sense--prevented the Appellate Division from ruling that stab wounds to any part of the body suffice to permit a finding of substantial risk of death if, without medical attention, those wounds cause a copious loss of blood within a few minutes. See generally People v. Griffin, 100 A.D.2d 659, 660, 473 N.Y.S.2d 851, 852 (3d Dep't 1984) (affirming first-degree-assault conviction under § 120.10(1) where "doctor who treated [the victim] testified that the wound would have been fatal had surgery not stopped the bleeding" of a stab wound to the buttocks).

Plainly, the Appellate Division's ruling in Irwin I--that, where an assault victim could have bled to death without treatment, his injuries were life-threatening within the meaning of

15

§ 10.00(10)--was in no sense an arbitrary application of New York law. In People v. Jeanty, 268 A.D.2d 675, 702 N.Y.S.2d 194 (3d Dep't), lv. denied, 94 N.Y.2d 949, 710 N.Y.S.2d 5 (2000), quoted by the Appellate Division in Irwin I, the court had rejected the defendant's contention that the State failed to prove that his victim sustained serious physical injury, noting, inter alia, that "[i]f [the victim's] injuries had been left untreated he could have bled to death," People v. Jeanty, 268 A.D.2d at 678, 702 N.Y.S.2d at 199; see also People v. House, 278 A.D.2d 244, 245, 717 N.Y.S.2d 273, 274 (2d Dep't 2000) ("medical proof established that the stab wound to the victim's chest was potentially lethal, and the victim has a scar" (emphasis added)), lv. denied, 96 N.Y.2d 784, 725 N.Y.S.2d 648 (2001); People v. Gordon, 257 A.D.2d 533, 533-34, 685 N.Y.S.2d 28, 28-29 (1st Dep't) (evidence was sufficient to establish serious physical injury because "defendant caused physical injury creating a substantial risk of death to the" victim "in the absence of speedy medical intervention"; "defendant stabbed this complainant in the upper abdomen, just below the rib cage, with a knife having a seven-inch blade," and the victim "bled copiously from the resulting wound, to the extent that her shirt was soaked with blood" (emphases added)), lv. denied, 93 N.Y.2d 899, 689 N.Y.S.2d 711 (1999); People v. Riccardi, 199 A.D.2d 432, 432, 605 N.Y.S.2d 112, 112 (2d Dep't 1993) (evidence was sufficient to establish serious physical injury as "[t]he victim's own testimony as well as that of the Emergency Medical Technician and the uncontroverted evidence of the People's medical expert that the wounds, if left untreated, were 'life-threatening'" (emphasis added)), lv. denied, 83 N.Y.2d 809, 611 N.Y.S.2d 145 (1994); see also People v. Thompson, 224 A.D.2d 646, 647, 639 N.Y.S.2d 52, 53 (2d Dep't) (medical evidence of "collapsed lung," "labored breathing[,] and substantial bleeding" caused by stab wounds to upper chest sufficed to establish life-threatening nature of the wounds; "there was no requirement that the People" also "present expert medical testimony"), lv. denied, 88 N.Y.2d 970, 647 N.Y.S.2d 724 (1996). The fact that in some of these cases a victim's wound met more than one of the

16

standards for "serious physical injury" is of no moment. The statutory definition is disjunctive. If the defendant's conduct caused "physical injury which creates a substantial risk of death, or" protracted disfigurement "or" protracted impairment of the functioning a bodily organ, N.Y. Penal Law § 10.00(10) (emphases added), it has caused "serious physical injury" within the meaning of that section.

Nor was it unreasonable for the Appellate Division to conclude that the evidence in Irwin's case, viewed in the light most favorable to the prosecution, was sufficient to permit the jury to find that Smalls's wounds were life-threatening if left untreated. The assault occurred at approximately 3 a.m.; Smalls fled to the Mini Mart where he collapsed, and the Mini Mart clerk called 911; police officers were dispatched at 3:02 and 3:06; and the emergency medical responders arrived at 3:10 to find two liters of blood on the ground and Smalls in shock. In addition, there was a long trail of blood from Smalls's car toward the gas pumps and from the pumps to where Smalls collapsed near the door of the Mini Mart, and there was blood throughout the front interior of Smalls's car. Thus, there was evidence that Smalls lost more than two liters of blood within some 10 minutes. Further, the EMS Report indicated that the medical responders worked on Smalls at the Mini Mart for some nine minutes, applying pressure in an attempt to staunch the flow of blood before taking him to the hospital. Despite receiving that emergency treatment, after Smalls arrived at the hospital at 3:22 one of his wounds was still "bleeding" "actively." Although Irwin points out that there was no trial testimony that such blood loss was life-threatening (see Irwin brief on the present appeal at 27, n.5), he did not argue to the Appellate Division (as a matter of either state law or due process) that the life-threatening effect of the loss of copious amounts of blood could not be established without expert testimony. Nor, if the other evidence is sufficient, is expert testimony required, see People v. Thompson, 224 A.D.2d at 647, 639 N.Y.S.2d at 53, and we see no denial of due process or any lack of reason or common sense in the Appellate Division's conclusion, without the need for expert

17

testimony, that there was a substantial risk that Smalls--who had lost two liters of blood in minutes and was still actively bleeding more than 10 minutes after first receiving emergency medical treatment--could have bled to death if he had received no treatment.

Irwin states that he "is not asking . . . this Court to find that, as a matter of New York State law, the loss of two liters of blood could not create a substantial risk of death." (Irwin reply brief on the present appeal at 12 (internal quotation marks omitted)). Rather, he argues principally that the record does not support a finding that Smalls in fact lost two liters of blood. He states that "[t]hat detail is not immediately apparent from the writings contained within the medical records placed into evidence at trial," and that "[t]hose records . . . characterized [Smalls's] bleeding as minimal." (Irwin brief on the present appeal at 27 n.5; see, e.g., id. at 7, 16, 22, 26, 30; see also Irwin brief on direct appeal at 8 (referring to Smalls's injuries as "minor cuts").) But whether apparent "immediately" or only upon a normal reading, it is clear that two records--which Irwin acknowledges were "in[] evidence at trial" (Irwin brief on the present appeal at 27 n.5)--stated explicitly that Smalls had lost "2 liters of blood on ground" (EMS Report) or referred to "2 l. blood loss at scene" (hospital's Emergency Physician Record). Neither of these records described Smalls's blood loss as minimal. It was well within the province of the jury to interpret other hospital records' references to Smalls's blood loss as "minimal" as describing his progress following treatment by hospital staff. But even if the records reflect conflicting assessments, the jury could rationally view the evidence as a whole as indicating that Smalls lost enough blood from his stab wounds to send him into shock and to imperil his life if he had not received medical treatment. And were a court to order the vacatur of a guilty verdict based on "inconsistencies" in the evidence, that decision would evince a "fail[ure]" to "review the evidence in the light most favorable to the prosecution." McDaniel v. Brown, 130 S. Ct. 665, 673 (2010).

In sum, given the evidence at trial, we cannot conclude that it was unreasonable for the state court to rule that Irwin failed to show, as required by United States Supreme Court precedent, that no rational juror could find that there was a substantial risk that Smalls could have bled to death had he not received medical attention.

B.  Irwin's IAC Claim With Respect to Count 6

It is undisputed that, prior to trial, Irwin's attorney Richard J. Graham, the last of a succession of attorneys to represent Irwin at the pretrial and trial stages, was unaware that there was a sixth count in the indictment.  That count, which began on the last page of the four-page indictment, charged Irwin with third-degree intimidation of a witness--eventually identified as trial witness Sydne Lee--by threatening physical harm if she testified against Irwin.  Graham, who knew that Count 5 charged Irwin with witness intimidation against Smalls in connection with Smalls's giving the authorities information against Irwin in a prior criminal investigation, first became aware of Count 6 during jury selection when the assistant district attorney referred to the fact that Irwin was charged with witness intimidation in two counts.  Graham then realized that the indictment was longer than the three pages he had in his possession.  He informed the trial court that he had received neither a complete copy of the indictment nor any pretrial discovery that referred to a second count of witness intimidation, and he therefore moved for the dismissal of Count 6.

The trial judge pointed out that it was obvious that the indictment was more than three pages long:  The third page ended in the middle of a sentence.  The court stated that at Irwin's arraignment a copy of the indictment had been given to the attorney who then represented Irwin; that the fact that Count 5 began, but did not end, on the third page of the indictment should have alerted whoever received the incomplete copy that there were more than three pages; and that the defense requests for information in discovery had been general and had been complied with appropriately. The court denied the motion to dismiss Count 6.

19

At trial, Lee was one of the eyewitnesses who described Irwin's attack on Smalls. She described the assault and identified the knife Irwin had used. With respect to Count 6 Lee testified that in March 2001, after she had been arrested on unrelated charges, she and Irwin were incarcerated in the same jail, and during a jail church service Irwin had threatened her and her children:

Q. . . . [D]id you happen to have any contact with [Irwin] while you were in the jail?

A. In church one day he told me snitches get stitches, or something like that.

. . . .

Q. And what did that mean to you?

A. Because of the -- of this trial right here, that basically I would get stitches because I ran my mouth.

Q. Did he make any type of physical gestures towards you?

A. The slitting of the throat thing (indicating).

Q. And did he make any remarks concerning any other members of your family?

. . . .

A. That my two kids -- well, it was between him and Flagg, that my son wasn't going to get off the school bus one day and that another date I wasn't going to make it home the day that I got out of jail . . . .

Graham cross-examined Lee with respect to her observation of the assault on Smalls and her description of the knife, but did not question her on the subject of Irwin's threat against Lee and her children.

Irwin, in his posttrial motion under § 440.10, asserted, inter alia, that Graham's lack of knowledge and preparation with regard to Count 6 constituted ineffective assistance of counsel on that count and the other counts:

Had [Graham] known about [Count 6], he could have investigated the circumstances under which the intimidation allegedly occurred and found that the prosecution's allegations weren't true. Specifically, it was alleged that I threatened Sydne Lee during a church service when we were both in jail. In fact, however, there was a guard in the church who strictly separated males from females and would have written me a disciplinary ticket if I had said anything to Ms. Lee. If Mr. Graham had become familiar with this count of the indictment and discussed it with me, he could have subpoenaed the guard as a defense witness and discredited Ms. Lee's testimony in its entirety.

(Affidavit of Brian Irwin dated November 2, 2007, at ¶ 11 (emphases added).)

The judge, who had presided over Irwin's trial, rejected this IAC claim. After noting that Graham had preserved on the record the possible objections to the receipt of an incomplete indictment and uninformative discovery, the court stated that Graham's failure to call the prison guard as a witness was not deficient performance because even if the guard testified that he had not observed Irwin threatening Lee, that testimony would have had little probative value:

The Court is not convinced by the defendant's allegation, that Attorney Graham was remiss in failing to investigate or in failing to call (as a witness at trial) the corrections officer supervising jail church services (on the day Sydne Lee stated she was threatened by the defendant) to state whether it was possible for the defendant to have intimidated Sydne Lee by drawing his finger across the front of his throat and mouthing "snitches get stitches." This is not the first time a defendant has alleged (in this Court)[ ]that it is impossible for female inmates to communicate with male inmates during church services at the jail. The Court is aware that while there is a clergy person and at least one corrections officer present during church services at the jail, it is impossible for the few staff members present to observe all of the inmates (attending services) at the same time in order to detect furtive communications between male and female inmates.

Irwin II, fourth page (emphasis added). The § 440.10 motion was denied; the Appellate Division denied leave to appeal.

In the present habeas proceeding, the magistrate judge recommended dismissing this IAC claim on the ground that the state court did not unreasonably conclude that Irwin had failed to satisfy either prong of the Strickland standard. The magistrate judge stated that Irwin's suggestion

21

that the prison guard could have provided testimony that would likely lead to his exoneration was speculative, see Magistrate Report at 29; that the state court had already found that subpoenaing the guard "would be fruitless and potentially harmful," id.; and that Graham had therefore instead pursued a reasonable alternative strategy, which was the type of tactical choice that is to be accorded deference under Strickland, see id. at 29-30. The district court adopted the recommendation without elaboration.

Although it is plain that Graham's performance fell below an acceptable standard when he failed to recognize that the copy of the indictment in his possession--which ended in mid-sentence--could not have been the complete indictment, Irwin's IAC claim centers on Graham's performance after he learned of Count 6. We see no error in the district court's rejection of the claim that Irwin was denied effective assistance of counsel by reason of Graham's failure, after learning of Count 6, to subpoena the prison guard to testify at trial.

The Strickland standard applicable to such claims is "highly demanding," Kimmelman v. Morrison, 477 U.S. 365, 382 (1986), and "rigorous," Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

> Under Strickland, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he "must show that counsel's performance was deficient," 466 U.S. at 687, 104 S.Ct. 2052, so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," id. at 690, 104 S.Ct. 2052; and (2) he must show "that the deficient performance prejudiced the defense," id. at 687, 104 S.Ct. 2052, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694, 104 S.Ct. 2052.

Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011). "[An] IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." Id. at 85; see, e.g., Strickland, 466 U.S. at 687, 697.

Further, just as AEDPA requires a federal habeas court to give deference to a state court's ruling on claims of insufficiency of the evidence (see Part II.A. above), AEDPA requires the federal habeas court to accord deference to the state court's ruling on claims of ineffective assistance of counsel.

> The standards created by Strickland and § 2254(d) are both "highly deferential," [466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles[ v. Mirzayance], 556 U.S.[ 111, 123], 129 S.Ct. [1411,] 1420[ (2009)] . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S. Ct. at 788 (emphases added).

Thus, although the state court must apply the standard established by the Supreme Court in Strickland, "[t]he pivotal question" for the federal habeas court "is whether the state court's application of the Strickland standard was unreasonable," Richter, 131 S. Ct. at 785.

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, th[e Supreme] Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, . . . it is a necessary premise that the two questions are different. . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (emphasis added).

> Under § 2254(d), a habeas court must determine what arguments or theories supported[,] or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Richter, 131 S. Ct. at 786 (emphasis added).

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or

23

> whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, Strickland asks whether it is "reasonably likely" the result would have been different. [466 U.S.] at 696, 104 S.Ct. 2052. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." Id., at 693, 697, 104 S.Ct. 2052. The likelihood of a different result must be substantial, not just conceivable. Id., at 693, 104 S.Ct. 2052.

Richter, 131 S. Ct. at 791-92 (emphases ours).

We see no basis in the present case for a conclusion that the decision of the state court on the § 440.10 motion was an erroneous or unreasonable application of either prong of Strickland. Lee's testimony on Count 6 was that at a jail church service Irwin made a "slitting of the throat" gesture and mouthed "snitches get stitches"--the same phrase, we note, that the witness Young testified Irwin had used in explaining his attack on Smalls. The state court reasoned that even if the guard on duty at the jail church service were able to testify that he had not seen such conduct, such testimony would be unlikely to result in Irwin's acquittal since "it is impossible for the few staff members present to observe all of the inmates (attending services) at the same time." Irwin II, fourth page. Although Irwin argues that "the jailhouse guard . . . would have revealed Lee's claim of intimidation to be a pure fabrication" (Irwin reply brief on the present appeal at 19), even routine cross-examination could be expected to elicit testimony that the guard was unable to watch everyone at once. We thus see nothing objectively unreasonable or contrary to common sense in the state court's conclusions (a) that testimony by the guard simply that he did not see Irwin threaten Lee would not have created a reasonable probability that Irwin would be acquitted on Count 6, and (b) that Graham's failure to call a likely ineffectual witness did not fall below the level of professional competence.

C.  The Request for an Evidentiary Hearing

The certificate of appealability granted by this Court also allowed Irwin to address the question of whether the district court should have held an evidentiary hearing before ruling on Irwin's habeas petition, and Irwin urges that we answer that question in the affirmative. We decline to do so. We note that after allowing Irwin to file his amended § 2254 petition, the court ordered and received a response by the State and received various affidavits, memoranda, and state-court exhibits.

Irwin has not presented any argument to show that an evidentiary hearing was needed with respect to the sufficiency of the evidence to support his convictions of assault in the first degree. There is no dispute that the testimony and medical records described above were in evidence at trial.

Irwin argues that "[t]he district court did not conduct the independent inquiry that would have demonstrated the absence of proof of serious physical injury" (Irwin brief on the present appeal at 53 (emphasis added)); but this argument--which cites only a case that was decided long prior to both AEDPA and Jackson v. Virginia--badly misconceives the role of the federal habeas court when it considers a sufficiency challenge to a state-court conviction. As discussed in Part II.A. above, even the state appellate court must consider the trial evidence in the light most favorable to the prosecution and defer to any rational inference that could have been drawn by the jury; and the federal habeas court must, in turn, give deference to any decision of the state court that is not objectively unreasonable. Neither court is permitted to assess the trial evidence de novo, or to conduct an independent factual inquiry, or to draw its own independent conclusions as to guilt or innocence.

Nor has Irwin presented any persuasive argument as to the need for an evidentiary hearing on the IAC claim covered by the COA. The record is clear that his trial attorney was unaware of Count 6 until the start of trial and that the attorney did not subpoena the prison guard to testify. Even assuming that it would have been permissible for Irwin to present to the district court evidence that was not presented to the state court on this claim, but see Cullen v. Pinholster, 131 S. Ct. at 1398

25

("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"), Irwin has not pointed to any relevant evidence that could have been produced at a hearing to show that the state court's assessment of this IAC claim under Strickland was not entitled to AEDPA deference.

Given that, as discussed in Part II.B. above, the state court reasonably found, inter alia, that Irwin failed to establish prejudice because the guard, if called as a witness, could not have testified that Irwin did not threaten Lee, and could have testified--at best--only that the guard did not observe the threats Lee described, we cannot conclude that an evidentiary hearing on this IAC claim was required.

CONCLUSION

We have considered all of Irwin's arguments that are within the scope of the certificate of appealability and have found them to be without merit. The judgment of the district court denying the amended habeas petition is affirmed.

POOLER, *Circuit Judge*, concurring:

I join the majority opinion as to Parts II.B and II.C, on Irwin's ineffective assistance of counsel claims and his request for an evidentiary hearing. I respectfully concur in the judgment as to Part II.A on Irwin's insufficiency of the evidence claim. We heard oral argument in this case on May 17, 2012. On May 29, 2012, the Supreme Court decided *Coleman v. Johnson*, 132 S. Ct. 2060 (2012), a case that, in my view, deprived Irwin of what had previously been a meritorious insufficiency of the evidence claim. It is clear that New York law places substantive limitations on what inferences a jury may draw in concluding that a defendant caused a substantial risk of death within the meaning of N.Y. Penal Law §§ 120.10(1) and 10.00(10), and that the jury in this case exceeded them. It is also clear that after *Johnson*, such limitations are irrelevant in habeas.

The majority concedes that the only fact in this case from which the jury could possibly conclude that Irwin was guilty beyond a reasonable doubt of assault in the first degree was Smalls's loss of two liters of blood. I agree that such a fact could theoretically allow a jury to conclude that Irwin caused a substantial risk of death. But in my view, New York law— properly applied— required the prosecution to introduce evidence in addition to the mere fact of that blood loss to allow the jury to draw the conclusion it created a substantial risk of death. As it was, the prosecution provided the jury no evidence, outside of the blood loss itself, from which they could reasonably conclude that the risk of death was *substantial*, rather than merely extant. Perhaps in implicit recognition of this lack of trial evidence, the government includes on appeal an extra-record footnote explaining the significance of two liters of blood in relationship to the total amount of blood in the human body—a simple notation, but a powerful one. This is the sort of evidence which, had it been provided to a jury, would ground in reason the conclusion

1

that Smalls's blood loss constituted proof beyond a reasonable doubt that Irwin caused a substantial risk of death.

Without such evidence, I cannot conclude that, as a matter of New York law at least, the state proved Irwin caused a substantial risk of death beyond a reasonable doubt. Other than the Appellate Division's decision here, I have found no New York case in which the bare and unsubstantiated possibility that a person might bleed to death absent medical intervention has constituted a substantial risk of death. New York's jurisprudence compels the opposite conclusion. In *People v. Sleasman*, 24 A.D.3d 1041 (3d Dep't 2005), the Third Department reduced a first-degree assault conviction where the victim "had sustained, among other injuries, a knife wound to her neck." *Id.* at 1042. The victim awoke twelve hours after she was stabbed to find herself "covered with dried blood." *Id.* After proceeding by ambulance to the hospital, her "wound was closed with butterfly sutures, [and] she was kept overnight for observation and released the following day." *Id.* Despite the severity of the injuries the victim sustained, the Appellate Division still found the evidence insufficient to show that the risk of death was substantial. The court wrote that

> [w]hile [the victim's] injury was characterized as having the potential to be life threatening, tests conducted at the hospital determined the wound to be a cut in the platysma muscle and disclosed no damage to her trachea, esophagus or the major vessels in her neck. She was given two units of blood, which stabilized her heart rate and blood pressure. Although testing revealed that her CPK enzyme level was elevated and a cause for concern, cross-examination revealed that the risk of death was not substantial. After reviewing and weighing all of the evidence in the record, we cannot say that it supports a finding of a substantial risk of death

*Id.* at 1042-43. The victim in *Sleasman* sustained blood loss at least as significant, if not more so, than that sustained by Smalls, since she, too, was "covered in blood" and, unlike Smalls, actually required a blood transfusion. The *Sleasman* victim was also stabbed in the neck, a far

2

more vulnerable part of the body than the hand or arm, where Smalls was injured. And yet the Appellate Division found this evidence insufficient for assault in the first degree. This case suggests that, at a minimum, a New York jury's ability to infer a substantial risk of death based only on blood loss—or even, as in *Sleasman*, significant blood loss in combination with injury to a vulnerable part of the body— is limited. And while *Sleasman* is most relevant to our analysis, it is far from the only New York case suggesting such a limitation. *See, e.g.*, *People v. Nimmons,* 95 A.D.3d 1360, 1360 (2d Dep't 2012) (reducing second degree assault conviction where victim suffered a gunshot wound to the chest, despite emergency medical technician's testimony as to the potential life threatening consequences because "the EMT's testimony, along with the victim's medical records, which were not explained or amplified by the testimony of a health care provider, were legally insufficient to establish that the injury to this victim 'create[d] a substantial risk of death'"); *People v. Tucker,* 91 A.D.3d 1030, 1031-32 (3d Dep't 2012) (reducing a first degree assault conviction where victim was stabbed eight times, including a wound "approximately four inches long and 2 ½ inches deep [which] transected the victim's rectus abdominis muscle," where bleeding was "not massive" and was "stopped with a few sutures," despite testimony from treating emergency room physician "that the wounds collectively 'could[ ] have caused substantial risk of death'"); *People v. Matos*, 107 A.D.2d 823, 824 (2d Dep't 1984) (finding evidence to be insufficient to support a conviction for first degree assault where victim of a gunshot wound to the leg required a three-day hospitalization).

The cases on which the majority and the government rely do not change this understanding of New York law. Unlike this case they all contain crucial other facts which would support the jury's finding of assault in the first degree. In *People v. Jeanty*, for example, on which the Appellate Division relied on in denying Irwin's claim, the victim "sustained seven

3

deep head or facial lacerations which were 1 to 3 inches in length and penetrated either the skull membrane or bone, requiring two layers of 50 sutures and resulting in permanent scarring." 268 A.D.2d 675, 678 (3d Dep't 2000). Given the disparity between the *Jeanty* victim's injury and Smalls's, the Appellate Division's determination there that a substantial risk of death had been shown because had the victim's "injuries [] been left untreated he could have bled to death," *id*., cannot fairly be used to support Irwin's conviction. In *People v. Gordon*, also cited by the majority, sufficient evidence was found where the victim was stabbed "just below the rib cage" with a seven-inch knife. 257 A.D.2d 533, 533-43 (1st Dep't 1999). Though the court noted that the victim "bled copiously from the resulting wound, to the extent that her shirt was soaked with blood," there was also evidence that she "was subjected to a CAT scan, an X-ray, and monitoring 'for a couple of days' to determine whether the heart, intestines or other vital organs had been damaged, which was a possibility from a knife wound in this area of the body." *Id.* In *People v. House*, the Appellate Division specifically indicated that "medical proof established that the stab wound to the victim's chest was potentially lethal." 278 A.D.2d 244, 245 (2d Dep't 2001). No such medical proof established the potential lethality of the wounds in this case. *People v. Riccardi* is similarly inapposite. 199 A.D.2d 432, 432 (2d Dep't 1992) ("The victim's own testimony as well as that of the Emergency Medical Technician and the uncontroverted evidence of the People's medical expert that the wounds, if left untreated, were 'life-threatening', is sufficient to support the jury's verdict."). Likewise, the victim in *People v. Thompson*, 224 A.D.2d 646, 647 (2d Dep't 1996), sustained not only "substantial bleeding" as a result of the stab wound to his chest, but also suffered a collapsed lung requiring treatment and hospitalization. None of these cases involve a conclusion of substantial risk of death based only on bleeding. They all contain *other* evidence, whether it be testimony from medical experts, as

4

in *Riccardi*, or evidence of extreme wounds, as in *Jeanty*, from which a jury could reasonably draw the conclusion that a substantial risk of death was attendant. In the absence of some evidence in addition to the mere fact of blood loss, New York law simply does not permit the inference the jury made here.

I recognize, of course, that "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). But the error in this case as to what inferences a jury may draw, seems part and parcel of a federal question: what is sufficient proof beyond a reasonable doubt? Or at least that was so before *Johnson*, which compels the conclusion that the limitations which inhere in New York law are irrelevant to our analysis of this case. *Johnson* tells us that it would be error "to look to [state] law in determining what distinguishes a reasoned inference from 'mere speculation.'" 132 S. Ct. at 2064. And while we continue to "look to state law for the substantive elements of the criminal offense . . . the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.*" Id.* (internal quotation marks and citation omitted). *Johnson* makes explicit that this minimum amount of evidence and what inferences can be drawn from it is guided solely by *Jackson v. Virginia,* 443 U.S. 307 (1979). Under *Jackson*, juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Johnson*, 132 S. Ct. at 2064 (quoting *Jackson*, 443 U.S. at 319). That discretion is so broad that "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 2065. And the only question under AEDPA is whether the state court's conclusion that that finding was not so insupportable was unreasonable. Though I have no doubt the state court was wrong, its determination that the jury's leap from blood loss to

5

substantial risk of death did not fall below the threshold of bare rationality was not "manifestly contrary to common sense," *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003).  Accordingly, I must reluctantly agree with the analysis of my colleagues and conclude that Irwin is not entitled to habeas relief.